UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,              Case No. 10-CR-0061 (PJS/AJB)

        Plaintiff,

v.

                             ORDER

(1) CLAYTON CRAIG HOGELAND,
(2) JENNIFER ROSE HOGELAND, and
(3) JEFFREY COLE BENNETT,

        Defendants.

---

Timothy C. Rank, Julie E. Allyn, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

John C. Brink, JOHN C. BRINK, LAWYER, for defendant Clayton Craig Hogeland.

Daniel L. Gerdts, DANIEL L. GERDTS, LAWYER, for defendant Jennifer Rose Hogeland.

David Kustoff, KUSTOFF & STRICKLAND, PLLC; James E. Thomas, LAW OFFICE OF JAMES E. THOMAS; Juni S. Ganguli, LAW OFFICE OF JUNI GANGULI; Andrew R. Small, COLICH & ASSOCIATES, for defendant Jeffrey Cole Bennett.

Defendants Clayton Craig Hogeland ("Craig") and Jeffrey Bennett ("Bennett") are former employees of Advantage Transportation ("Advantage"), a Minnesota company that arranges the shipment of freight for various clients. From 2003 through 2005, Craig and Bennett worked together to defraud Advantage of hundreds of thousands of dollars. Bennett created sham companies, and those sham companies sent bills to Advantage for goods and services that were never provided. Craig arranged for the fraudulent invoices to be paid by Advantage. Bennett kept a portion of the payments for himself, and he kicked back a portion of the payments to Craig in the form of checks written to Craig's wife, defendant Jennifer Hogeland ("Jennifer"). Craig

and Jennifer also received kickbacks through a separate fraudulent scheme involving an employee of American Airlines; those kickbacks also took the form of checks written to Jennifer. Craig, Jennifer, and Bennett did not initially report their ill-gotten gains as income on their tax returns; later, however, after learning that they were under investigation, Craig, Jennifer, and Bennett filed amended returns. All three defendants went to trial, and all three defendants were convicted on all counts. Craig and Bennett were convicted of mail fraud, conspiracy to commit mail fraud, conspiracy to launder money, and tax evasion; Jennifer was convicted of tax evasion.

This matter is before the Court on the parties' objections to the Presentence Investigation Reports ("PSRs"), as well as on a number of pro se motions filed by Bennett.[1] The Court held an evidentiary hearing regarding the objections on July 24, 2012. Having considered the entire

---

[1]Shortly after the evidentiary hearing on the parties' objections, Bennett filed a motion to terminate his retained counsel. *See* ECF No. 304. Before the Court could rule on his motion, Bennett filed a number of pro se motions, including a motion for a new trial, a motion for acquittal, and a motion for the undersigned to recuse. These motions were filed in violation of previous orders of the Court, in which the Court made clear to Bennett that he was not to file pro se motions while he was represented by counsel. *See, e.g.*, ECF No. 234 at 2-3 ("As long as Bennett is represented by counsel, Bennett must act only through his counsel. Bennett may not file pro se motions, letters, or other communications with the Court.").

Because it was not clear whether Bennett wanted to retain new counsel or proceed pro se, the Court held a hearing under *Faretta v. California*, 422 U.S. 806 (1975). At the *Faretta* hearing, Bennett chose to proceed pro se. The Court therefore will rule on the pro se motions that Bennett filed after he moved to discharge his counsel.

The Court notes that Bennett also filed pro se motions to extend the time in which to respond to the government's memorandum on the parties' objections to the PSR. *See* ECF Nos. 313, 314. The Court grants these latter motions and notes that it has fully considered Bennett's two pro se memoranda regarding his PSR, which memoranda Bennett has already filed. *See* ECF Nos. 316, 317.

record — including the evidence at trial — the Court makes the following rulings on the parties' objections and on Bennett's motions.[2]

## I. OBJECTIONS TO PSRs

### A. Number of Victims

The government contends that both Craig and Bennett should receive an enhancement under § 2B1.1(b)(2) of the Guidelines, which provides for a 2-level increase in the offense level if the offense involved ten or more victims. The government theorizes that every employee of Advantage whose compensation was tied to Advantage's profits should count as a separate victim. The government candidly admits, however, that it is not aware of any case law that supports this theory, and the Court rejects it. If the government's theory were correct, it is difficult to imagine a limiting principle on the definition of "victim." Anytime someone steals from a company, the company's income and profit margin are reduced — and any time a company's income and profit margin are reduced, there are ripple effects felt by others, including partners, shareholders, employees, customers, and vendors. The Court therefore overrules the government's objection and will not apply an enhancement under § 2B1.1(b)(2) to either Craig or Bennett.

---

[2] At the July 24, 2012 hearing, the Court also took evidence regarding other matters, such as Craig's motion for a downward departure on the basis of his poor health and the government's allegations that Bennett has engaged in dishonest and abusive conduct since being convicted. The Court will make rulings on and discuss its consideration of this evidence at the parties' respective sentencing hearings. To be clear, however, the Court reiterates what it told Bennett at his *Faretta* hearing: The Court does not intend to place any weight on evidence of fraudulent activities or abusive behavior in which Bennett has allegedly engaged since his conviction.

*B.  Tax Loss*

Craig's and Jennifer's PSRs found the tax loss, for purposes of their tax-evasion

convictions, to be $73,803, which figure was derived from the government's trial exhibit 131.

Craig, Jennifer, and the government all object to this finding.[3]

### 1.  The Government's Objection

The government objects that the tax loss should be increased by $14,249 to account for

the federal tax loss for 2006 and the state tax losses for 2003 to 2005.  *See* Gov't Hr'g Ex. 1

(chart of additional taxes).  The Court agrees.  Every court of appeals to address the issue has

held that unpaid state taxes are properly included in the tax-loss calculation under § 2T1.1(c)(1).

*See, e.g.*, *United States v. Yip*, 592 F.3d 1035, 1039 (9th Cir. 2010) ("in adopting the rule that

§ 2T1.1 may include state tax loss, we join all the other circuits that have considered the issue").

In addition, the Eighth Circuit has recognized that, as a general matter, state offenses can

constitute "relevant conduct" under § 1B1.3 of the Guidelines.  *See United States v. O'Hagan*,

139 F.3d 641, 655-56 (8th Cir. 1998) (district court did not err in including loss amounts from

crimes for which the defendant was convicted in state court).  The Court therefore sustains the

government's objection and includes the state tax losses in the tax-loss calculation.[4]  The tax loss

---

[3]Jennifer originally objected to this amount on the basis that, under § 2T1.1(c)(1), the tax loss should be treated as 28 percent of the unreported gross income, unless a more-accurate determination of the tax loss can be made.  At the July 24, 2012 evidentiary hearing, however, Jennifer withdrew this objection.

[4]The Court also sustains the government's objection as to the 2006 federal tax loss.  The evidence at trial established that the Hogelands continued to receive kickbacks from the fraudulent schemes in 2006, *see, e.g.*, Gov't Trial Exs. 60, 65, 67, and the Hogelands have not offered any reason why the federal taxes due on this income should not be included in the tax loss.  The Court notes, however, that the 2006 federal tax loss is not enough to trigger a higher

(continued...)

attributable to Craig and Jennifer therefore exceeds $80,000, and the base-offense level

associated with these offenses is 16.  *See* U.S.S.G. § 2T4.1(F).

## 2.  The Hogelands' Objections

The Hogelands object that the tax loss should be revised to exclude payments made to

Jennifer that were not income, but instead either loans to Jennifer or repayments of loans made

by Jennifer.  The only evidence that any of the payments were loans or loan repayments,

however, is that Bennett wrote (or caused to be written) "loan" or "loan repayment" on the memo

lines of some of the checks made payable to Jennifer.  *See, e.g.*, Gov't Trial Ex. 32.  Having

observed the evidence at trial, however, the Court finds both that these payments were not loans

or loan repayments and that the Hogelands knew that they were not loans or loan repayments.

As to the first point:  Other than the notations on the checks, there is absolutely no

evidence — such as a promissory note, other loan documents, or bank records — that the

Hogelands ever loaned money to Bennett or that Bennett ever loaned money to the Hogelands.

The notations on the checks mean nothing, as they were either written by Bennett — who, the

evidence at trial established, is dishonest — or by someone acting at Bennett's direction.

Moreover, as witness Adel Valdez testified, an examination of bank records reveals no evidence

of any transfer of funds from Jennifer to Bennett that could have been a loan.  If *Craig* had made

a loan to Bennett, then there would be no reason why Bennett's "repayment" checks were made

payable to *Jennifer*.  A far more probable inference is that the notations on the memo lines —

---

[4](...continued)
offense level, and thus the Court's ruling on this issue will not affect sentencing.  In addition, the
Court notes that, because Craig's Guidelines range is driven by his money-laundering convictions
and not his tax convictions, any change in the calculation of tax loss will not affect his ultimate
Guidelines range.

and the decision to pay Jennifer rather than Craig — were clumsy attempts to disguise the nature of the payments.

As to the second point: In light of the Court's conclusion that the payments were in fact the proceeds of Craig's fraudulent schemes, there can be no question that Craig knew that the payments were unreported income. For her part, Jennifer argues that she was ignorant of Craig's fraud, and therefore she could reasonably have believed that these payments were in fact loans or loan repayments. The Court agrees that there is insufficient evidence to find that Jennifer knew that the payments were the fruits of crimes committed by her husband. But that does not mean that Jennifer did not know that the payments — whatever their source — should have been reported as income. After all, the checks were made payable to Jennifer — who, it should be noted, worked as a bookkeeper and is familiar with accounting principles. The evidence at trial pointed to no reason why most of the checks from Bennett and the others would be made payable to Jennifer except the obvious one: that the Hogelands were trying to camouflage the nature of the payments.

The evidence also established that Jennifer was very familiar with her family's finances and in fact often took the lead in organizing financial documents and communicating with her family's tax preparers. It is highly unlikely that Jennifer, a trained bookkeeper, believed that Bennett's payments to her were loan repayments — as the memo lines sometimes suggested — in the absence of any evidence that Jennifer ever loaned money to Bennett. It is also highly unlikely that Jennifer believed that Bennett was somehow repaying a loan that *Craig* had made to Bennett. Given Jennifer's intimate knowledge of her family's finances, it is unlikely that Jennifer would not be aware of such a loan, had one in fact been made. Moreover, as discussed

earlier, if Craig had loaned money to Bennett, there is no plausible reason why Bennett would repay the money to Jennifer. Instead, it is far more likely that Jennifer knew that these checks had nothing to do with any loan and, like the other checks, had been made payable to her in order to camouflage the true nature of the payments. The Court therefore overrules the Hogelands' objections to the tax loss.

### C. Loss from Phony-Consultant Scheme

Craig objects to the amount of loss attributed to the phony-consultant scheme. Briefly stated, under this scheme, Craig used Advantage's money (without Advantage's knowledge) to pay bribes to Carl Frey, an employee of American Airlines, in return for Frey hiring Advantage to ship freight for American Airlines. (Craig later recruited a man named William Braswell to help in the scheme.) Frey (and later Braswell) paid a portion of the bribes back to Jennifer as kickbacks. Craig contends that the bribes should not be considered part of the loss in this case because the profit that Advantage earned from American Airlines' business exceeded what it paid in bribes. The Eighth Circuit recently rejected a similar argument in *United States v. Lange*, 592 F.3d 902 (8th Cir. 2010): "Lange cites no authority for the astonishing proposition that an employee is entitled to this kind of credit if the employer profited from business transactions conducted by the employee while embezzling." *Id.* at 906. The Court therefore overrules Craig's objection and includes the bribes as part of the loss in this case.

### D. Legal Fees as Restitution

Craig and Bennett object to the inclusion of Advantage's legal and investigatory fees of $69,608.86 in the restitution award. As a general matter, a victim's legal and investigatory fees are recoverable as restitution in a criminal case. *See United States v. Stennis-Williams*, 557 F.3d

927, 930 (8th Cir. 2009) (district court did not err in including estate's investigative costs in the restitution order); *United States v. DeRosier*, 501 F.3d 888, 897 (8th Cir. 2007) ("Our case law has specifically approved of the inclusion of attorney's fees and investigative costs in a restitution award when these losses were caused by the fraudulent conduct.").

There is no doubt that Advantage incurred legal fees and investigatory expenses in connection with this case. But the government has not provided any evidence to support the $69,608.86 figure, and thus the Court is unable to determine whether that figure accurately represents the fees and expenses that Advantage incurred. *See United States v. Chalupnik*, 514 F.3d 748, 754 (8th Cir. 2008) ("When an MVRA victim is identified, the government must prove 'the amount of the loss sustained by [the] victim as a result of the offense' by a preponderance of the evidence." (quoting 18 U.S.C. § 3664(e)). The Court therefore sustains Craig's and Bennett's objections to the inclusion of the fees and expenses in the restitution award.

### E. Roles in the Offense

#### 1. Craig and Bennett

Craig's and Bennett's PSRs recommend that they each receive a 4-level enhancement for their roles in both the mail-fraud and money-laundering offenses. Section 3B1.1(a) of the Guidelines provides for a 4-level role enhancement when "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 n.1. Where there are fewer than five participants, the criminal activity may nevertheless be considered "otherwise extensive" if it involved the unknowing services of many outsiders. *United States v. Louper-Morris*, 672

F.3d 539, 561-62 (8th Cir. 2012). A leadership role is determined by the nature of the defendant's role in the offense, the recruitment of accomplices, and the degree of participation in planning or organizing the offense. *Id.* at 565. The enhancement is not limited to the person who originally planned or instigated the criminal activity, and there may be more than one organizer or leader with respect to an offense. *Id.*

The Court has no doubt that both Craig and Bennett were organizers or leaders with respect to both the mail-fraud and money-laundering charges. Craig recruited Frey and Braswell into the phony-consultant scheme; indeed, Craig initiated the scheme by suggesting that he pay Frey a kickback through Frey's business. Craig later increased the amount of the kickbacks and instructed Frey to pay a portion of them to Jennifer. Craig also successfully advocated for Advantage's accounting personnel to report to him, which made it less likely that his schemes would be detected. Last but not least, Craig (together with Jennifer) received a substantial share of the proceeds of these two fraudulent schemes.

As for Bennett, the evidence established that Bennett set up four companies — three of them complete shams — through which he received money stolen from Advantage; that he recruited Cynthia Tiegelmann to be an unwitting accomplice in processing checks to and from one of these companies; that he exerted management and control over the proceeds of the phony-invoice scheme; and that, like Craig, he received a substantial share of the proceeds of that scheme. (Indeed, Bennett received well over $100,000 more than Craig did from the scheme.) This evidence establishes that both Craig and Bennett were organizers or leaders with respect to the mail-fraud and money-laundering offenses. *Cf. United States v. Mickle*, 464 F.3d 804, 807-

08 (8th Cir. 2006) (more than one participant can qualify as an organizer or leader and it is not necessary that the participants be equally culpable).

In order to warrant a 4-level increase, however, the criminal activity must have either involved five or more "participants" or been "otherwise extensive." U.S.S.G. § 3B1.1(a). As noted, a participant is a person who is criminally responsible for the offense. The government contends that, at least with respect to Craig, there were five participants: Craig, Bennett, Jennifer, Frey, and Braswell. But this argument fails to account for the fact that there were two distinct schemes, and only Craig and Jennifer were involved in both. Bennett was not involved in the phony-consultant scheme, and Frey and Braswell had nothing to do with the phony-invoice scheme. Moreover, as discussed above, the Court does not believe that there is sufficient evidence to conclude that Jennifer was a knowing participant in either of the fraudulent schemes. The Court cannot conclude, therefore, that there were five or more "participants" as that term is defined in § 3B1.1.

The Court agrees with the government, however, that the schemes were "otherwise extensive" within the meaning of § 3B1.1. As noted, a scheme may be considered "otherwise extensive" if it involved "the unknowing services of many outsiders . . . ." U.S.S.G. § 3B1.1 n.3. In addition to the number of unwitting accomplices, courts also consider the amount of loss caused by the offense, *United States v. Brockman*, 183 F.3d 891, 900 (8th Cir. 1999), as well as "the nature and complexity of the operation and its geographical reach," *United States v. Rosas*, 486 F.3d 374, 377 (8th Cir. 2007) (citation and quotations omitted). The Eighth Circuit has held that a fraudulent scheme that generates proceeds of over $250,000 may be deemed "otherwise extensive." *Morphew v. United States*, 909 F.2d 1143, 1145 (8th Cir. 1990) ("Whether or not

there were five or more persons involved, it is plain that an enterprise generating a 'take' of over a quarter million dollars can properly be regarded as 'extensive.'").

Applying these standards, the Court concludes that both of the fraudulent schemes, and the related money-laundering conspiracy, were "otherwise extensive."  The phony-invoice scheme alone generated proceeds of nearly $400,000 over a period of roughly three years.  It also involved companies incorporated in Tennessee, Mississippi, Arizona, and Illinois and was perpetrated through the unwitting services of a number of individuals, including Cynthia Tiegelmann, who processed checks for one of Bennett's sham companies, opened that company's bank account, and permitted her address to be used as the corporate address; Will Henderson, who (among other things) helped incorporate some of Bennett's companies; Diane Goembel, an Advantage accounting employee who signed many of the fraudulent checks to Bennett's companies; and, of course, Jennifer Hogeland, who accepted and deposited a large portion of the fraudulent proceeds.  The Court therefore overrules Craig's and Bennett's objections to the 4-level role enhancements.

### 2. Jennifer

Jennifer objects to the finding that she was an average participant and argues that she should be given a minor-participant reduction under § 3B1.2.  The Court disagrees.  Jennifer was convicted of tax evasion.  The evidence at trial established that much of the income on which she and Craig failed to pay taxes was paid directly to her in the form of checks.  The evidence also established that she was the primary contact for her family's tax preparers and provided the information on which the false tax returns were based.  Jennifer cannot be considered a minor participant with respect to the crime of *tax evasion*, and her objection is therefore overruled.

*F. Sophisticated Means*

All three defendants object to the sophisticated-means enhancement.[5]  With respect to Bennett and Craig, the Court has no trouble concluding that the sophisticated-means enhancement should apply.  Bennett and Craig perpetrated and hid their fraud by establishing and using four different companies and creating phony invoices.  Bennett also invented a fake identity (Harvey Gross) to associate with some of the phony invoices.  This is more than sufficient to warrant a sophisticated-means enhancement.  *See United States v. Benz*, 470 Fed. Appx. 531, 533 (8th Cir. 2012) (repetitive and coordinated transactions involving false documents justified sophisticated-means enhancement).

With respect to Jennifer, however, the Court does not agree that the enhancement should apply.  As discussed above, the Court believes that, while there is sufficient evidence to find that Jennifer knew that she and Craig were unlawfully failing to pay taxes on the payments that she was receiving from Craig's associates, there is not sufficient evidence to find that Jennifer knew that Craig and his associates were engaging in criminal activity.  Therefore, Jennifer should not be held responsible for the sophisticated way in which the unreported income underlying her tax-evasion offenses was obtained.  In sum, then, the Court overrules Craig's and Bennett's objections, but sustains Jennifer's objection.

---

[5]Craig's PSR recommends a sophisticated-means enhancement under § 2B1.1(b)(10)(C) for both the mail-fraud and money-laundering offenses and a sophisticated-means enhancement under § 2T1.1(b)(2) for the tax-evasion offenses.  Because Jennifer was convicted only of tax evasion, her PSR recommends a sophisticated-means enhancement under only § 2T1.1(b)(2).  Bennett's PSR recommends a sophisticated-means enhancement under § 2B1.1(b)(10)(C) with respect to the mail-fraud and money-laundering offenses but, for reasons that are unclear, does not recommend a similar enhancement for the tax-evasion offenses.  In any event, the relevant language in the application notes to both Guidelines sections is identical and the Court will therefore analyze them together.

*G. Abuse of Trust*

Craig's PSR applied a 2-level enhancement for abuse of trust under § 3B1.3 for both the

mail-fraud and money-laundering offenses. For the abuse-of-trust enhancement to apply, the

government must prove that (1) the defendant occupied a position of public or private trust and

(2) the defendant used this position in a manner that significantly facilitated the commission or

concealment of the offense. *United States v. Miell*, 661 F.3d 995, 998 (8th Cir. 2011). A

position of public or private trust is "characterized by professional or managerial discretion" and

"[p]ersons holding such positions ordinarily are subject to significantly less supervision than

employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3

n.1.

The Court has no doubt that Craig occupied a position of private trust with respect to

Advantage. The evidence at trial established that Craig was a manager who had full

discretionary authority to conduct Advantage's business, enter into contracts with vendors and

sales agents, and approve invoices. Craig was subject to very little supervision by Advantage's

owners, who clearly placed great trust in him. There is also no doubt that Craig used this

discretion and freedom from supervision to conduct his fraudulent schemes. He approved the

phony invoices and even arranged for accounting personnel to report directly to him in order to

make his fraud more difficult to detect.

It is true, as Craig points out, that this enhancement "does not apply in the case of an

embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not

characterized by" the kind of professional or managerial discretion that justifies the

enhancement. U.S.S.G. § 3B1.3 n.1. But this argument only highlights the difference between

Craig and an ordinary bank teller or hotel clerk.  Craig had authority to approve the phony

invoices and enter into contracts with vendors, and he also had supervisory authority over the

accounting personnel for the business.  This combined authority meant that Craig not only had

the ability to steal — like a bank teller or hotel clerk — but he also had the ability to conceal his

crime from his employer in a way that an ordinary bank teller or hotel clerk cannot.  Craig's

objection to this enhancement is overruled.

### H.  Failing to Report Income from Criminal Activity

As discussed above, the Court has found that there is insufficient evidence to conclude

that Jennifer knew that the unreported income was derived from criminal activity.  The Court

therefore sustains Jennifer's objection to this enhancement.  *See* U.S.S.G. § 2T1.1(b)(1).

### I.  Obstruction of Justice[6]

In July 2008, after learning that the IRS was conducting a criminal-tax investigation,

Bennett engaged H&R Block to prepare several tax returns, including a 2004 tax return for

American Logistics Advisors (one of his sham companies).  *See* Gov't Trial Ex. 224; *see also*

Gov't Trial Ex. 245 (government letter attaching letters from Bennett stating that he had filed the

2008 tax returns).  On the return, American Logistics Advisors took a deduction for contract

---

[6]The government originally suggested that the Hogelands should receive obstruction-of-justice enhancements because they made false statements to the Court in connection with obtaining publicly funded counsel.  *See* ECF No. 288 at 2; ECF No. 289 at 2.  At the evidentiary hearing, however, the government clarified that it is not seeking an obstruction enhancement on this basis, but rather intends to argue that the Court should take these circumstances into account in determining an appropriate sentence under 18 U.S.C. § 3553(a).  The Court will therefore defer a determination on this issue until the Hogelands' respective sentencing hearings.  In addition, the Court intends to inquire at the sentencing hearings whether further proceedings are necessary to determine whether the Hogelands should be ordered to repay the cost of their publicly funded counsel.

labor in the amount of $41,765. Gov't Trial Ex. 224. At Bennett's direction, H&R Block also prepared a Form 1099 showing that the $41,765 in contract labor had been paid to a man named John T. Currey. Currey, who had once worked with Craig and Bennett, had died in 2006. Currey's widow, Stacey Currey, testified at trial that she is certain that her husband was not paid $41,765 by American Logistics Advisors in 2004. The Court credits Currey's testimony and finds that Bennett knowingly caused false documents (including a false Form 1099) to be created and filed. In other words, the Court finds that, even when Bennett knew that he was under criminal investigation, he still attempted to cheat on his taxes and mislead the government.

Bennett's PSR recommends a 2-level obstruction-of-justice enhancement for each of his three groups of offenses based on his role in preparing these false documents. Although the Court was initially skeptical that this enhancement should apply in these circumstances, the commentary to § 3C1.1 and Eighth Circuit case law establish that an obstruction-of-justice enhancement is applicable when a defendant prepares false documentary evidence during an official investigation. *See* U.S.S.G. § 3C1.1 n.4(C); *United States v. Waldner*, 580 F.3d 699, 707-08 (8th Cir. 2009) (obstruction-of-justice enhancement properly applied where, in preparation for sentencing, defendant produced two forged documents purporting to be invoices that were designed to evade IRS reporting requirements); *United States v. Martin*, 369 F.3d 1046, 1061 (8th Cir. 2004) (backdating a check to create a paper trail of false exculpatory evidence constituted obstruction of justice). It is noteworthy that, in this case, Bennett chose a deceased person to be the purported recipient of these nonexistent contract payments, which is strong

evidence that Bennett was trying to cover his tracks in a way that would be difficult to detect.[7] The Court therefore overrules Bennett's objection to the obstruction-of-justice enhancement.

The Hogelands also filed amended tax returns after learning that they were under investigation. So far as the Court is aware, however, none of the information in those amended returns was false, and the Hogelands' PSRs did not recommend obstruction-of-justice enhancements. The government did not initially object. But at the evidentiary hearing, the government suggested that the Hogelands should both receive an obstruction enhancement because, in filing the amended returns, the Hogelands created misleading exculpatory evidence about their intent with respect to the original returns. The Court cannot understand how the filing of *accurate* amended tax returns could fairly be characterized as obstructing justice, and the government cites no law to support its novel interpretation of § 3C1.1. The Court finds that the obstruction-of-justice enhancement does not apply to the Hogelands.

## J. Bennett's Profits

Bennett objects to the statement in ¶ 15 of his PSR that he kept more than $250,000 of the fraudulent proceeds for himself.[8] Bennett contends that, to the contrary, he kept less than $200,000. The calculations in the PSR, however, are based on evidence at trial that traced the source and destination of the money that was stolen from Advantage. It is reasonable to infer that Bennett kept the money that he did not kick back to the Hogelands, and there is no evidence

---

[7]It is also evidence of the character of Bennett, who risked inflicting a large and wholly unjust tax obligation on the widow of his recently deceased friend in order to avoid paying taxes on money that he — and not his friend — had been paid.

[8]Bennett's earnings from the scheme do not directly affect his Guidelines range; the Court nevertheless addresses this objection because the Court has relied on Bennett's earnings in making other findings.

from which the Court could draw a contrary conclusion.  Bennett's objection is therefore

overruled.

## II.  BENNETT'S MOTIONS

### *A.  Recusal*

Bennett moves for the undersigned to recuse from this case under 28 U.S.C. § 455(a),

which requires disqualification "in any proceeding in which [the judge's] impartiality might

reasonably be questioned."[9]  Disqualification under § 455(a) is required "if a reasonable person

who knew the circumstances would question the judge's impartiality, even though no actual bias

or prejudice has been shown."  *United States v. Wisecarver*, 644 F.3d 764, 771 (8th Cir. 2011)

(citation and quotations omitted).  Judges are presumed to be impartial and parties seeking

recusal bear "the substantial burden of proving otherwise."  *United States v. Dehghani*, 550 F.3d

716, 721 (8th Cir. 2008) (citation and quotations omitted).

---

[9]In a supplemental memorandum in support of his motion, Bennett indicates that he seeks
a ruling on his motion from Chief Judge Michael J. Davis.  (The Court has also recently received
copies of two letters to the same effect that Bennett sent to Judge Davis, which the Court has
directed the Clerk's Office to docket in this case.)  There is no requirement that a § 455 motion to
disqualify be heard by a different judge than the one whose disqualification it seeks.  *See Karim-*
*Panahi v. U.S. Congress, Senate and House of Representatives*, 105 Fed. Appx. 270, 274-75
(D.C. Cir. 2004).  Indeed, such motions are almost always decided by the judge whose recusal is
sought.  The Court sees no need to transfer Bennett's motion to a different judge.

The Court notes that Bennett also alludes to the procedure under 28 U.S.C. § 144, which
requires recusal when a party "makes and files a timely and sufficient affidavit that the judge
before whom the matter is pending has a personal bias or prejudice either against him or in favor
of any adverse party . . . ."  Bennett has not filed such an affidavit, however.  *See In re Medlock*,
406 F.3d 1066, 1073 (8th Cir. 2005) (an affidavit must strictly comply with all of the statutory
requirements before it will disqualify a judge); *United States v. Faul*, 748 F.2d 1204, 1210 (8th
Cir. 1984) ("When an affidavit does not meet the requirements imposed by law, the judge should
not disqualify himself.").  Even if Bennett had done so, the Court would find the affidavit to be
legally insufficient for the same reasons that it finds that recusal under § 455 is not required.

Bennett cites the following circumstances that, he contends, demonstrate bias or prejudice on the part of the undersigned: The undersigned repeatedly ordered Bennett not to file a pro se motion under the Speedy Trial Act (or any other pro se motion) while he was represented by counsel and stated that he would get "mad" if Bennett defied the Court's orders and did so anyway; the undersigned later stated that, had Bennett filed a pro se motion to dismiss the indictment under the Speedy Trial Act, the motion would have been denied; Bennett's mother filed a complaint against the undersigned on the basis that Don Oren, the owner of Advantage, is a friend of and major contributor to former U.S. Senator Norm Coleman (who supported the undersigned's nomination to the federal bench) and has unspecified ties to the University of St. Thomas School of Law (which the undersigned helped to establish); the undersigned has made disdainful remarks about Bennett, such as that "the jury has plenty of evidence to convict" and "it's not like Mr. Bennett has any credibility"; the undersigned took Bennett into custody upon conviction but allowed his codefendants to remain free pending sentencing; the undersigned did not allow one of Bennett's witnesses to testify; and the delay in sentencing has been prejudicial.

None of these circumstances, either individually or in combination, requires disqualification.[10] As a general rule, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Scenic Holding, LLC v. New Bd. of Trs. of Tabernacle Missionary Baptist Church, Inc.*, 506 F.3d 656, 665 (8th Cir. 2007) ("The grounds Scenic asserts in favor of recusal consist mainly of

---

[10]The Court also notes that Bennett's motion is untimely to the extent that it relies on facts that he has known for many months. *See Fletcher v. Conoco Pipe Line Co.*, 323 F.3d 661, 664 (8th Cir. 2003) (motion under § 455 must be raised at the earliest possible moment after obtaining knowledge of relevant facts).

judicial rulings, routine trial administration, and unremarkable admonishments, all of which are

inadequate to require the district judge's disqualification."); *Fletcher v. Conoco Pipe Line Co.*,

323 F.3d 661, 665 (8th Cir. 2003) ("An adverse ruling does not constitute a sufficient basis for

disqualification without a clear showing of bias or partiality.").  As the Supreme Court has said,

> opinions formed by the judge on the basis of facts introduced or
> events occurring in the course of the current proceedings, or of
> prior proceedings, do not constitute a basis for a bias or partiality
> motion unless they display a deep-seated favoritism or antagonism
> that would make fair judgment impossible.  Thus, judicial remarks
> during the course of a trial that are critical or disapproving of, or
> even hostile to, counsel, the parties, or their cases, ordinarily do not
> support a bias or partiality challenge.

*Liteky*, 510 U.S. at 555.  "*Not* establishing bias or partiality . . . are expressions of impatience,

dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and

women, even after having been confirmed as federal judges, sometimes display." *Id.* at 555-56.[11]

The undersigned has no recollection of stating that "it's not like Mr. Bennett has any

credibility," but the undersigned will assume that he made such a remark for purposes of this

motion.  Such a remark would not require recusal because it would be made entirely "on the

basis of facts introduced or events occurring in the course of the current proceedings . . . ." *Id.*

at 555.  The evidence introduced at trial established that Mr. Bennett is an extremely dishonest

and deceptive man, which is one of the reasons why the Court did not allow him to remain free

pending his sentencing hearing.[12]  As the Eighth Circuit has said, "[f]orming judicial opinions on

---

[11]Nor is a judge required to disqualify himself simply because a litigant files a complaint
alleging judicial misconduct.  *Proctor v. Engstrom*, 95 Fed. Appx. 192, 194 (8th Cir. 2004)
(citing *In re Mann*, 229 F.3d 657, 658 (7th Cir. 2000)).

[12]The Court has fully explained why it ordered that Bennett be taken into custody pending
(continued...)

credibility concerning parties and their counsel is expected; in fact, necessary." *Am. Prairie Constr. Co. v. Hoich*, 560 F.3d 780, 791 n.2 (8th Cir. 2009). Similarly, the statement that "the jury has plenty of evidence to convict" is an ordinary remark of a type made every day by district and appellate judges who must decide whether there is sufficient evidence to submit a case to a jury. Likewise, the undersigned's statement that he would get "mad" if Bennett filed a pro se motion to dismiss under the Speedy Trial Act — a remark made after Bennett pulled a microphone away from his attorney and, in defiance of two explicit written orders not to directly address the Court while he was represented by counsel (*see* ECF Nos. 231, 234), interrupted a hearing by making a third attempt to bring such a motion — displays no more than the "impatience, dissatisfaction, annoyance, and even anger" that does not require recusal. *Liteky*, 510 U.S. at 555-56.

The Court also rejects Bennett's argument that the undersigned's statement that he would have denied Bennett's Speedy Trial motion is evidence of bias.[13] Bennett's argument implies that the Court formed an opinion about the merits of Bennett's motion without knowing anything about it — and thus that the Court's opinion must reflect bias against Bennett. But Bennett's

_____

[12](...continued)
his sentencing hearing. *See* ECF Nos. 271, 286. That decision reflects no bias toward Bennett, but instead the factors described in the Court's orders. Bennett's situation is not remotely comparable to his co-defendants'. Craig is suffering from a debilitating, life-threatening disease that requires him regularly to receive emergency medical care, and Jennifer committed crimes that were much less serious than Bennett's, is facing a sentence that will likely be much lower than Bennett's, and, unlike Bennett, has primary responsibility for caring for young children.

[13]The undersigned further notes that, contrary to what Bennett claimed at his *Faretta* hearing, Bennett had been informed that he had the option to fire his attorneys or obtain different counsel if he was unhappy with his attorneys' refusal to file a Speedy Trial motion. *See* ECF No. 231.

premise is wrong.  Prior to the commencement of the trial in this case, the undersigned ruled on

multiple motions to exclude time under the Speedy Trial Act.  All of those motions (save one)

were filed by Bennett himself (either alone or in conjunction with the Hogelands); in response to

the one motion filed by the government, Bennett not only said that he had no objection to a delay,

but he asked for a delay that was two months longer than the delay sought by the government.

ECF No. 206.  On each occasion on which Bennett asked this Court to delay the trial — and on

the one occasion on which the government, with Bennett's support, asked this Court to delay the

trial — the Court examined the facts and the law and decided that a delay of the trial either would

or would not violate the Speedy Trial Act.  In other words, the Court had already *ruled* on every

component of the motion that Bennett sought to bring — and the Court did so only after

considering the arguments and evidence of the parties.  Having found that each delay that it

approved did *not* violate the Speedy Trial Act, the Court obviously would not have found (in

response to Bennett's pro se motion) that the very same delays *did* violate the Speedy Trial Act.

The Court is well aware that — as Bennett has pointed out — *Zedner v. United States*,

547 U.S. 489 (2006), holds that defendants cannot prospectively waive their Speedy Trial rights.

Indeed, the fact that the Court *denied* several of Bennett's motions to continue the trial — and the

fact that the Court started the trial in November 2011, when Bennett was asking for the trial to be

put off until January 2012 — demonstrates the Court's understanding of this principle.  The

Court therefore rejects Bennett's argument that the remark is evidence of bias.[14]

---

[14]The Court also rejects Bennett's argument that the delay in his sentencing is somehow
evidence of bias.  This Court is one of the busiest in the United States, and, unfortunately, the
delay experienced by Bennett is not the slightest bit unusual — particularly given that this is a
complex, multi-defendant, white-collar case in which the parties have made numerous objections

(continued...)

The only "extrajudicial" source of bias to which Bennett points is Don Oren's alleged connections to Senator Coleman and the University of St. Thomas (and the formal complaint allegedly filed by Bennett's mother concerning those connections). Before reading Bennett's current motion, the undersigned was unaware that Bennett's mother had filed a complaint. Based on what Bennett asserts in his motion, Bennett's mother evidently believes that the undersigned is a close friend of Senator Coleman and that the undersigned is therefore biased against anyone (including her son) who may have stolen from one of Senator Coleman's friends (including Don Oren[15]).

The factual premise of this claim is incorrect. The undersigned is not a friend of Senator Coleman's. Indeed, the undersigned had never met Senator Coleman before August 2005, when Senator Coleman, on the recommendation of a committee that had screened applications for the vacant federal judgeship in Minnesota, interviewed the undersigned and several other candidates at his office in St. Paul. The undersigned has also not seen Senator Coleman since September 2006, when Senator Coleman (along with many other public officials) attended the undersigned's investiture. In all, the undersigned has had only a handful of contacts with Senator Coleman — all of which were professional contacts that occurred during the approximately one-year period between the time that the undersigned applied for the open judgeship and the time of the

---

[14](...continued)
to the PSRs (requiring an evidentiary hearing) and in which one of the defendants (Bennett) has filed a continuous stream of pro se motions, including a motion to fire his trial counsel and proceed pro se (requiring another hearing).

[15]Bennett's mother seems unaware of the fact that this Court ruled *against* Oren in an unrelated case involving an allegedly defective recreational vehicle that Oren had purchased for $340,000. *See Highway Sales, Inc. v. Blue Bird Corp.*, 504 F. Supp. 2d 630 (D. Minn. 2007), *rev'd in part* 559 F.3d 782 (8th Cir. 2009).

undersigned's investiture. Contrary to the allegations of Bennett's mother, then, the undersigned is not and never has been a personal friend of Senator Coleman's.

Moreover, the undersigned was not aware of any connection between Oren and Senator Coleman, or between Oren and the University of St. Thomas. And even if a reasonable person, knowing the relevant facts, would have expected the undersigned to know of such a connection, *see Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 859-61 (1988), that would not reasonably create an appearance of bias or prejudice. *Cf. Fletcher*, 323 F.3d at 665 ("Generally, a court will deny a recusal claim alleging no more than a friendship between a judge and a witness because the fact that a judge is a friend of a witness does not ordinarily warrant an inference that the judge would be predisposed to credit that witness' testimony." (citation and quotations omitted)). Hundreds of thousands of Minnesotans have connections to Senator Coleman (who served as Mayor of St. Paul, ran for Governor, and was elected to the United States Senate) or the University of St. Thomas (the largest private university in Minnesota). As one of only seven active judges in the District of Minnesota, the undersigned can hardly be expected to recuse in every case that involves such a person. Bennett's motion for recusal is denied.

### B. New Trial

Bennett moves for a new trial on numerous grounds, including that (1) he was convicted of charges not included in the indictment; (2) the Court failed to instruct the jury on the element of specific intent; (3) the Court's instructions impermissibly amended the indictment; (4) the government failed to prove all the elements of his crimes beyond a reasonable doubt; (5) his counsel failed to object to venue in the District of Minnesota as to the tax-evasion charges;

(6) the government failed to prove to the grand jury that venue was proper as to the tax-evasion

charges; (7) the tax-evasion charges were misjoined with the other charges against him; (8) the

evidence does not support his convictions; and (9) the indictment was defective.  The

government objects to this motion as untimely.  *See* ECF No. 328.

The jury returned its verdict against Bennett on December 6, 2011.  *See* ECF No. 260.

Bennett mailed his motion for a new trial on August 3, 2012.  *See* ECF No. 307-5.  "Any motion

for a new trial grounded on any reason other than newly discovered evidence must be filed within

14 days after the verdict or finding of guilty."  Fed. R. Crim. P. 33(b)(2).  With one possible

exception, Bennett's motion is not based on any contention that he has newly discovered

evidence.

On page 59 of his brief in support of his motion, Bennett refers to "newly discovered

evidence" pertaining to his argument about improper venue.  It is not entirely clear to what

evidence Bennett is referring, but he appears to be referring to unspecified evidence that he lives

in Tennessee and that he prepared, signed, and filed his tax returns in Tennessee.  Bennett does

not explain why such evidence was unknown or unavailable to him at the time of trial, nor does

he show that he was diligent in trying to uncover it.  To the contrary, Bennett has presumably

always known where he lives and where he prepared, signed, and filed his tax returns; there is no

reason why Bennett could not have uncovered evidence of these facts before trial.  (Indeed, so far

as the Court is aware, these facts are undisputed.)  To the extent that Bennett seeks a new trial

based on newly discovered evidence, therefore, his motion fails.  *See United States v. Rubashkin*,

655 F.3d 849, 857 (8th Cir. 2011) (a successful Rule 33(b) movant must show, among other

things, that the evidence was unknown or unavailable to him at the time of trial and that he was

duly diligent in trying to uncover it). Because the remainder of his motion is not based on newly discovered evidence, it is denied as untimely.

## C. Acquittal

Bennett also moves for a judgment of acquittal under Fed. R. Crim. P. 29, raising essentially the same grounds that he raised in his Rule 33 motion for a new trial. As with Bennett's motion for a new trial, the government objects to this motion as untimely. *See* ECF No. 328. A motion for acquittal must be filed within 14 days after a guilty verdict or after the court discharges the jury, whichever is later. Fed. R. Crim. P. 29(c)(1). Bennett mailed this motion on August 10, 2012, more than eight months after the jury returned its verdict and was discharged. *See* ECF No. 308-5. This motion is thus also untimely and is therefore denied.

## CONCLUSION

Based on the foregoing, the Court finds as follows: Craig Hogeland's offense level is 31; Jennifer Hogeland's offense level is 16; and Jeffrey Bennett's offense level is 29. The amount of restitution that Craig and Bennett each owe is reduced by the $69,608.86 attributable to Advantage's claimed legal and investigatory fees. The Court will defer a ruling on the parties' departure and variance motions until their respective sentencing hearings. Finally, to the extent that the parties have any outstanding objections to the PSRs, the Court need not rule on them as they will not affect sentencing. *See* Fed. R. Crim. P. 32(i)(3)(B).

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  The government's objections to the number of victims and the failure to impose obstruction-of-justice enhancements against Craig and Jennifer Hogeland are OVERRULED.

2.  The government's objection to the tax loss attributable to Craig and Jennifer Hogeland is SUSTAINED.  The Court finds that the tax loss attributable to these defendants exceeds $80,000 and their base-offense level for the tax charges is 16.

3.  Craig Hogeland's objections to the tax loss, the loss attributable to the phony-consultant scheme, and the enhancements for leadership role, sophisticated means, and abuse of trust are OVERRULED.

4.  Craig Hogeland's objection to the amount of restitution is SUSTAINED.  The amount of restitution is reduced by $69,608.86.

5.  Jennifer Hogeland's objections to the tax loss and role in the offense are OVERRULED.

6.  Jennifer Hogeland's objections to the enhancements for sophisticated means and failure to report income from criminal activity are SUSTAINED.

7.  Jeffrey Bennett's objections to ¶ 15 and to the enhancements for leadership role, sophisticated means, and obstruction of justice are OVERRULED.

8.  Jeffrey Bennett's objection to the amount of restitution is SUSTAINED.  The amount of restitution is reduced by $69,608.86.

9.  Jeffrey Bennett's motions for additional time and to clarify [ECF Nos. 313, 314] are GRANTED.  The time for Bennett to file memoranda relating to PSR

objections is retroactively extended to August 22, 2012. No further memoranda will be accepted.

10.      Jeffrey Bennett's motions for a new trial, for acquittal, and for recusal [ECF No. 307, 308, 320] are DENIED.

11.      All parties are ORDERED to file their final memoranda regarding sentencing no later than Friday, October 26, 2012.

Dated: October 15, 2012            s/Patrick J. Schiltz_____
                                           Patrick J. Schiltz
                                           United States District Judge